# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of: | ) |
| | ) |
| Information associated with email address | ) Case No. 17- M- 1393 |
| isagreg@lakefield.net that is stored at premises owned, | ) |
| maintained, controlled, or operated by Nsight. See | ) |
| Attachment A-2. | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

Information associated with email address isagreg@lakefield.net that is stored at premises owned, maintained, controlled, or operated by Nsight. See Attachment A-2.

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B-2.

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: 18 U.S.C. §§ 371, 1341, 1343, and 1957

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Jesse Leming, IRS-CI
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: 11/27/17

*Judge's signature*

City and State: Milwaukee, Wisconsin

William E. Duffin , U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## FOR A SEARCH WARRANT

I, Jesse Leming, a Special Agent (SA) with Internal Revenue Service, Criminal Investigations (IRS-CI), being duly sworn, depose and state as follows:

### INTRODUCTION

1.      I make this affidavit in support of an application for search warrant for information associated with a certain account stored at premises controlled by (1) Network Solutions, LLC/Web.com Group, Inc., an email provider headquartered at 12808 Gran Bay Parkway, West, Jacksonville, FL 32258; and (2) Nsight, an email provider headquartered at 450 Security Boulevard, P.O. Box 19079, Green Bay, WI 54307-9079. The information to be searched is described in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Network Solutions, LLC/Web.com Group, Inc. and Nsight to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am employed as a Special Agent with the Internal Revenue Service, Criminal Investigation (IRS-CI) and have been so employed since January 2003. As a Special Agent, my responsibilities include the investigation of potential criminal violations of Title 26 (the Internal Revenue Code), Title 31 (the Bank Secrecy Act), and Title 18 of the United States Code.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from witnesses and investigators from the

Wisconsin Department of Financial Institutions – Division of Securities ("Wisconsin Division of Securities"). This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that the information associated with the accounts identified in A-1 and A-2 contains evidence concerning violations of 18 United States Code, Sections 371, 1341, 1343, and 1957 (The "**Subject Offenses**"), as described in Attachments B-1 and B-2.

## <u>BACKGROUND OF THE INVESTIGATION</u>

5.      Law Enforcement has been investigating James Nickels and Gregory Anderson since August 2017. This investigation was initiated after a state investigation was completed by securities examiners with the Wisconsin Department of Financial Institutions - Division of Securities ("Wisconsin Division of Securities"). This investigation led to the Wisconsin Division of Securities commencing administrative enforcement proceedings against James Nickels, Gregory Anderson, The Fiscal Concierge, LLC and the Fiscal Concierge Manager, Inc. for multiple violations of the Wisconsin Uniform Securities Law.

6.      Based on a review of the state investigation and order, law enforcement suspected that Nickels was operating a "Ponzi" scheme.

7.      Nickels was a financial advisor in Manitowoc, Wisconsin and the surrounding area from approximately 1980 to 2006. Nickels worked as a broker for companies such as Merrill Lynch, Raymond James, and Capital Financial Management.

8. According to the Wisconsin Division of Securities and the State of Illinois Securities Department, Nickels was the subject of numerous disciplinary actions by securities regulators in both states. These actions included:

    a. A Warning Letter was issued by the Wisconsin Division of Securities on September 21, 1993 following customer allegations of excessive and unauthorized trading in customer accounts.

    b. Nickels' securities' licenses were suspended for two (2) days by the Division in July 1998 for excessive and unauthorized transaction in customer accounts.

    c. Nickels' securities' license was revoked by the State of Illinois' Securities Department in January 1999 as a result of the July 1998 suspension in Wisconsin.

    d. An undertaking and agreement between Nickels and the Wisconsin Division of Securities during revocation proceedings instituted in 2006. Pursuant to the agreement, Nickels was suspended for ninety (90) days. Nickels agreed to surrender his securities agent license in 2007, and not re-enter the securities business as a securities agent, broker-dealer, or investment advisor.

9. In 2006, Nickels formed a limited liability company named The Fiscal Concierge, LLC which he operated until at least September of 2017. In 2009, Nickels formed a Wisconsin corporation named The Fiscon Manager Inc. The Fiscon Manager, Inc. then became the manager of The Fiscal Concierge and was responsible for the reporting of income and expenses related to The Fiscal Concierge, LLC. At all times

material, The Fiscon Manager, Inc. was solely owned and controlled by Nickels. The Fiscal Concierge and the Fiscon Manger Inc. will be referred to collectively herein as "Fiscal Concierge."

10.　　Fiscal Concierge marketed itself as a bill pay service provider, which would use access to a customer's checking account to make timely payments of any bills the customer contracted Fiscal Concierge to handle. Fiscal Concierge charged its customers between $20-60 per month for its bill payment services. Since its inception, Fiscal Concierge never had more than 44 bill pay customers, and almost all of the money deposited into the company has come from promissory note investors rather than from services provided.

11.　　From May 1, 2007 through September 12, 2016, Nickels and Fiscal Concierge offered and sold promissory notes totaling approximately $5.1 million to at least 39 Wisconsin residents, one (1) Illinois resident, and (1) Michigan resident. None of the promissory notes were registered with the Wisconsin Division of Securities as required by law. If these notes had been registered, Nickels would not be allowed to offer them due to the agreement made between he and the Wisconsin Division of Securities in 2007.

12.　　The promissory note terms promised investors annual returns, paid in monthly installments, of at least eight percent (8%) for the duration of one (1) year. The notes could be renewed annually at the investors' discretion. Nickels marketed the notes as producing a higher rate of return than investors could receive at a bank, and further touted that Fiscal Concierge had never missed an interest or principal payment. He also sent frequent updates to his promissory note holders that announced positive

developments for the company regarding growth and expansion to agencies and organizations focused on providing services to the elderly or disabled in other states.

13.     Greg Anderson performed tax preparation and accounting services for Fiscal Concierge and Nickels from 2006 to 2007 and more recently from 2014 to present. Anderson was a partner at Ihlenfeld, Skatrud & Anderson ("ISA") until 2009, when he stepped down as a partner but continued as an independent contractor pursuant to an agreement between ISA and Anderson.  In early 2014, Anderson joined Fiscal Concierge's advisory board and formally invested in two promissory notes totaling $25,000.  Investors interviewed by your affiant stated Anderson mentioned his investment in Fiscal Concierge when encouraging them to invest with Nickels.

### FRAUD SCHEME

14.     Nickels provided some investors with a one (1) page marketing piece ("Marketing Piece") informing them of the details of Fiscal Concierge's promissory note terms.  The Marketing Piece represented that Fiscal Concierge had never missed an interest or principal payment to any note holder.  The Marketing Piece did not disclose any of the investment risks to promissory note holders of Fiscal Concierge.

15.     Analysis of Nickels and Fiscal Concierge's banking and corporate financial records show the following apparent transactions and trends, each of which is indicative of a "Ponzi" scheme:

     a.  Funds from an investor or multiple investors were received into Nickels business account and then a different investor was paid;

     b.  Payments of interest to investors and repayments of principal were wholly dependent on the infusion of capital from new investors;

    c.   Funds from an investor or multiple investors were received into Nickels

business account.  Funds were then transferred from the business account

to Nickels personal account.

16.    Nickels continued to distribute the Marketing Piece to solicit investors for

Fiscal Concierge after October 21, 2013, when he missed his first interest payment to a

note holder.  Nickels began to miss several more interest payments to note holders in

February 2014.

17.    In August 2014, the estate of a deceased investor notified Nickels that the

promissory note held by the deceased investor, which would mature on January 31, 2015,

would not be renewed and would need to be paid out to settle the estate.  Despite

approximately six (6) months' notice, Nickels was unable to repay the note to the estate

when it came due, but still continued to distribute the Marketing Piece after January 31,

2015.

18.    Nickels continued to distribute the Marketing Piece after the deceased

investor's estate filed a lawsuit on March 27, 2015 against Nickels for failure to make

payment.  The Marketing Piece was not revised and was distributed through at least

October 21, 2015.

19.    Nickels also distributed a marketing folder with documents indicating that

Fiscal Concierge was bonded and sent out regular emails which misrepresented Fiscal

Concierge as a profitable, successful company when in fact it had never made a profit,

was insolvent, and could not pay its debts and obligations as they became due, including

interest and principal payments to promissory note holders.

20.     Analysis of investments made by twenty-eight (28) of the living investors shows they invested a collective total of over $3,860,000 in Fiscal Concierge promissory notes, of which approximately $3,760,000 is outstanding.

## FINANCIAL CONDITION OF FISCAL CONCIERGE AND NICKELS

21.     As part of its investigation, the Wisconsin Division of Securities subpoenaed bank account information of Nickels and Fiscal Concierge, requested multiple reports from Fiscal Concierge's QuickBooks accounting software, and obtained Fiscal Concierge's corporate tax returns. Analysis of these documents by both the Wisconsin Division of Securities and IRS-CI show that the company has never been a profitable business at any time, and that Nickels and Fiscal Concierge have never been able to make principal or interest payments to earlier investors without the infusion of additional money from another investor or investors. From 2010 through 2015, Fiscal Concierge's average annual revenue for its bill paying services was approximately $7,774, yet its average annual expenses and deductions averaged approximately $463,000. In addition to these expenses, Nickels took distributions from the company of $825,000. The table below summarizes financial information from Fiscal Concierge's QuickBooks accounting reports. The numbers reported on Fiscal Concierge's income tax returns are similar.

| Year | Fiscal Concierge Gross Receipts | Fiscal Concierge Total Expenses | Fiscal Concierge Net Income (Loss) | Notes Payable | Nickels Distributions |
|------|------|------|------|------|------|
| 2010 | $3,378.18 | $387,871.24 | ($384,493.06) | $1,491,788.65 | $169,826.00 |
| 2011 | $4,961.65 | $430,749.17 | ($425,787.52) | $2,361,200.00 | $143,301.00 |
| 2012 | $8,111.69 | $457,846.49 | ($449,734.80) | $2,845,900.00 | $123,634.00 |
| 2013 | $10,952.30 | $490,227.52 | ($479,275.22) | $3,425,900.00 | $114,460.00 |
| 2014 | $9,019.41 | $431,322.94 | ($422,303.53) | $3,969,999.97 | $108,024.00 |
| 2015 | $10,218.15 | $583,144.31 | ($572,926.16) | $3,933,966.62 | $165,755.00 |
| Total | $46,641.38 | $2,781,161.67 | ($2,734,520.29) | | $825,000.00 |

22.     Bank account records provided by both Bank First National and Investors Community Bank were analyzed going back to 2010. These records show that Fiscal Concierge maintained a business checking account at Bank First National from September 2006 through May 2016. The signors on this account were James Nickels and Paul Wallander. Analysis of the deposit items and checks written show that Nickels conducted nearly all of the financial transactions in the account. Investors Community Bank records show that Fiscal Concierge maintained a business checking account at Investors Community Bank from April 1, 2016 through December 31, 2016. Nickels is the only person with signature authority on this account. Analysis of the deposit items and checks written on the account show that Nickels conducted nearly all the transactions in the account.

**ANDERSON'S KNOWLEDGE OF FISCAL CONCIERGE'S FINANCES**

23.     Nickels had his personal tax returns and Fiscal Concierge's business tax returns prepared by accounting firm Ihlenfeld, Skatrud, & Anderson ("IHS") for tax years 2006 to 2007 and more recently from 2014 to present.

24.     Division staff interviewed Gary Opichka on September 14, 2016. Opichka stated essentially:

    a.  Opichka is a partner at IHS. Opichka said that although Anderson represents himself to people as an operating partner of the firm, he is actually an independent contractor.

    b.  Opichka did not have detailed knowledge of Fiscal Concierge's finances. Opichka said Anderson was the primary person responsible for dealing with Nickels and Fiscal Concierge and would have an understanding of

Fiscal Concierge's finances. Anderson compiled Fiscal Concierge's financial information for tax years 2013 and 2014 the end of each year, calculated the numbers to be placed on Fiscal Concierge's return, and provided those numbers to another IHS partner, Ned Jacquart. Jacquart then took Anderson's numbers and input them onto Fiscal Concierge's corporate tax returns.

 c. Anderson compiled Nickels personal financial information for tax years 2013 and 2014 at the end of each year, calculated the numbers to be placed on Nickel's personal tax returns, and provided those numbers to Opichka. Opichka then took Anderson's numbers and input them onto Nickels' personal tax returns.

25. As a result of his professional relationship with Nickels and Fiscal Concierge, Anderson was aware of the financial condition of Fiscal Concierge and Nickels' annual income drawn from the company. Despite this knowledge, he regularly solicited his accounting clients to invest in promissory notes of Fiscal Concierge since February 5, 2014 at the latest. Investor interviews conducted by Wisconsin Division of Securities and IRS-CI show that Anderson's solicitations resulted in at least seven Wisconsin residents investing in Fiscal Concierge promissory notes.

### SUMMARY OF INVESTOR INTERVIEWS

26. Several of the investors are admittedly unsophisticated investors and several of the investors are elderly. The investors were told, and believed, that their investments in Fiscal Concierge were going to be used to fund the operations of a growing and successful business. At no time did Nickels or Anderson provide any

prospective investors with an accurate representation of Fiscal Concierge's financial condition. Investors were told a variety of things to include that their investments were "guaranteed" to earn a fixed rate of return.

27.     Promotional literature used induce investments, copies of promissory notes, investments funds into Fiscal Concierge, interest payments to investors, and communications intended to delay repayment, i.e.: lulling communications, were often transmitted by means of wire communications in interstate commerce and/or mail sent or delivered by the Postal Service.

**EXAMPLES OF SPECIFIC INVESTOR TRANSACTIONS AND USE OF EMAIL**

28.     On October 3, 2017, law enforcement interviewed Fiscal Concierge investor D.K. D.K. stated essentially:

    a.  D.K. first invested with Nickels in 2013.

    b.  Nickels represented to D.K. that her investment would be used to grow Fiscon's business.

    c.  Between 2013 and 2017, Nickels routinely told D.K. that the business was growing. Nickels routinely represented that the business was entering into contracts with government agencies and privately owned elder care facilities in Wisconsin, Florida, and Michigan. Nickels made these representations to D.K. over email, the phone, and in person at his office.

    d.  D.K. specifically asked Nickels what would happen if his business encountered problems and she wanted her money back. Nickels told D.K. he would be able to cover her investment by liquidating the assets of The Fiscal Concierge and personal assets including his home if the need arose.

e.  Nickels transmitted promissory notes and the Marketing Piece to D.K. by email on October 21, 2015. D.K. provided me with a printed copy of this email that she had kept. The email indicates it was sent by **jnickels@thefiscon.com** and had a signature line reading "Jim Nickels."

f.  D.K. liquidated her 401k and a Roth IRA account and invested $147,387.20 in Fiscal Concierge promissory notes on or about February 1, 2016. D.K.'s decision to invest was made based in significant part on the representations contained in the Marketing Piece sent to her by email, specifically, the false statements related to Fiscal Concierge not missing any interest or principal payments to investors.

g.  D.K. has been repaid a total of $12,152.58 of the investment. The last payment she received was on or about May 23, 2016. D.K. said she routinely emails Nickels to inquire about the status of her investment.

h.  D.K. could not locate electronic copies of any email correspondence to or from Nickels that took place before her investment on February 1, 2016.

i.  D.K. was able to locate electronic copies of emails exchanged between her and Nickels from September 27, 2016 through April 14, 2017. Nickels sent at least 34 emails to D.K. All of these emails show that they were sent from **jnickels@thefiscon.com**. In two of these emails, Nickels made representations indicating that he and his accountant were actively seeking new investors with the intent of taking new investment funds to pay earlier investors. The email chain shows that Nickels' emails were sent from

jnickels@thefiscon.com. These emails end with a standard signature reading:

> Jim Nickels
> The Fiscal Concierge LLC
> 980 Maritime Drive, Suite 6
> Manitowoc WI 54220
> Phone: 920-686-8810
> Fax: 920-682-9774
> www.thefiscon.com
> **jnickels@thefiscon.com**

29.     D.K. stated she had sent and received additional emails to/from Nickels, but she could not locate them in her email account.

30.     The $147,387.15 invested by D.K. on February 1, 2016 was deposited to Fiscal Concierge's business bank account. These funds were used to pay $19,785.13 in interest due to other investors, $20,000.00 in principal to another investor who was demanding repayment, a single transfer of $50,000 to Nickels' home equity line of credit on February 3, 2016, $12,300 to personal accounts held by Nickels and his wife, and $29,120.36 to expenses related to Fiscal Concierge.

31.     Based on the information contained in this affidavit and the evidence obtained during this investigation, I submit the $50,000 transferred from Fiscal Concierge's business bank account to Nickels' home equity line of credit referenced in paragraph 30 above constitute or were derived from proceeds traceable to specified unlawful activity, namely, a scheme to defraud investors by use of wire communications, in violation of 18 U.S.C. § 1343. The transfer of these funds involved financial institutions and the value was over $10,000, and therefore was in violation of Title 18 U.S.C. § 1957.

32.     On October 2, 2017, law enforcement interviewed Fiscal Concierge

investor S.E., who stated essentially:

a.  Greg Anderson was S.E.'s tax accountant for approximately 10 years,
    since about 2005. Anderson knew that S.E.'s aunt passed away and that
    S.E. would be receiving a distribution from the estate. Anderson told S.E.
    that he knew a guy, Jim Nickels, who was offering a good deal if she
    wanted to get in on it. Anderson said Nickels would pay 8% interest on
    money invested. Anderson explained that Nickels needed capital to fund a
    business named The Fiscal Concierge. Anderson told S.E. that The Fiscal
    Concierge was a bill-pay service primarily focused on assisting elderly
    clients.

b.  Nickels transmitted promissory notes and a modified version of the
    Marketing Piece to S.E. by email on February 5, 2016. S.E. provided me
    with a printed copy of this email that she had kept. The email indicates it
    was sent by **jnickels@thefiscon.com** and had a signature line reading
    "Jim Nickels." The recipients of the email were S.E. and
    **isagreg@lakefield.net**.

c.  S.E. received additional emails from Nickels between February of 2016
    and June of 2016. These emails were promotional in nature and reflected
    The Fiscal Concierge in a positive way. Based on the Promissory Note
    details, documents and emails, S.E. thought The Fiscal Concierge was a
    growing and successful business. S.E. also had phone conversations with
    Nickels during this period. Nickels described the business in a positive

tone that led S.E. to believe the business was healthy and growing. Nickels represented that The Fiscal Concierge was gaining access to huge customer bases by entering into agreements with various government agencies and health care facilities in different states.

d. S.E. invested $10,000 into one of Nickels promissory notes on or about June 15, 2016. S.E. transmitted the signed promissory note to Nickels by U.S. Mail. Nickels transmitted the final copy, signed by him, back to S.E. by email from the **jnickels@thefiscon.com** email address.

e. Nickels made one interest payment to S.E. in July of 2016. S.E. has received no money since. S.E. corresponds with Nickels in an attempt to recoup her investment. S.E. provided law enforcement with an email from Nickels dated September 11, 2017. In this email, sent from **jnickels@thefiscon.com**, Nickels states that "we received some good news that I will share with you shortly." S.E. indicated this is the typical generic response she gets in response to her inquiries.

33. On October 2, 2017, law enforcement interviewed Fiscal Concierge investor S.K. S.K. stated essentially:

a. S.K. met Jim Nickels though Greg Anderson. Anderson was S.K.'s tax accountant from approximately 2006 through 2016.

b. Anderson originally floated the idea of investing with Nickels in or about April of 2015. S.K. didn't invest at that time.

c. Anderson again brought up the idea of investing with Nickels in April of 2016. Anderson told S.K. the investment was to promote growth in The

Fiscal Concierge's business and, in return, S.K. would earn 8% interest. S.K. decided to invest $25,000 with Nickels.

d. S.K. did not receive any financial statements related to The Fiscal Concierge before investing. S.K. said he invested based on the "continual recommendation" of Anderson, who was a reputable CPA in Manitowoc. Anderson told S.K. that he (Anderson) had money invested in Nickel's promissory notes.

e. Both Nickels and Anderson failed to disclose the true financial condition of Fiscal Concierge, their past regulatory history related to securities, and the missed interest and principal payments to S.K. before S.K. invested.

f. S.K. invested $25,000 with Nickels on April 27, 2016.

g. S.K. received one (1) interest payment in or about May of 2016. S.K. has not received money since.

h. S.K. said he corresponded with Greg Anderson via email about the status of his investment and provided a printed copy of an email from Greg Anderson. The email was dated September 14, 2016, which was two weeks after Anderson was interviewed about the scheme by investigators from the Wisconsin Division of Securities. The email was sent from **isagreg@lakefield.net**. In the email, Anderson writes:

*re the notes and Fiscal Concierge.......jim did get 1-2 months behind due to some unplanned early redemptions/paydowns due to some estates getting involved with a deceased noteholder, etc....but last I heard things were getting back on track re cash flows and financing....I still have my 25k in it too.....and they are getting some good traction with some bigger groups that can really get things to the next level.*

34. The $25,000.00 invested by S.K. on April 27, 2016 was deposited to Fiscal Concierge's business bank account at Investors Community Bank on May 2, 2016. These funds were combined with $15,000.00 of funds deposited by another investor and funds already in the account on May 3, 2016 to bring the account balance up to $41,274.16. In the seven day period from May 3, 2016 through May 10, 2016, these funds were used to pay $11,628.11 in interest due to other investors, $10,000.00 in principal to another investor's estate that was demanding repayment, $8,100 to personal accounts held by Nickels and his wife, and $10,149.92 to expenses related to Fiscal Concierge.

## OTHER KNOWN EMAILS FROM ANDERSON

35. Anderson touted the notes as offering a higher return than traditional financial institutions, and more predictable tax consequences and income when compared to investing in mutual funds. One such email was provided to the Wisconsin Division of Securities by Nickels' attorney in response to a request for records related to Fiscal Concierge. This email was sent on February 5, 2014 from **isagreg@lakefield.net** to several of Anderson's accounting clients as well as Nickels at **jnickels@thefiscon.com**. The subject line of the email read "a cure for those nasty 1099's from mutual funds." In the email, Anderson touted Fiscal Concierge as "a solution" that would provide "better than average yields (not those joke rates for bank accounts and cds)." Anderson went on to describe Fiscal Concierge as:

> *"an area company who is growing tremendously, has expanded into other parts of the country, and is on "the cusp" of attracting some suitors for a buyout (or taking it public) in the coming 1-2 years. But meanwhile they could hasten this growth with added funds...and they are offering one year notes (not stock...a pure loan due in a year) with an 8% yield (with*

*interest paid out monthly, if you desire) this way you get actual $$$...are not dependent on the roller coaster values of the stock market."*

36.     Other emails provided to the Wisconsin Division of Securities by Nickels' attorney in response to a request for records related to Fiscal Concierge show that Anderson regularly referred his clients to Nickels, provided information to Nickels on how to "close" clients to invest in the notes, and supplied clients' personal information regarding their assets, liquidity, and investment goals.  The earliest such email is dated May 11, 2007.  These emails were transmitted between **jnickels@thefiscon.com** and **isagreg@lakefield.net**.

37.     On or about October 13, 2017, Network Solutions, LLC/Web.com Group Inc. was served with a request under 18 U.S.C. § 2703(f) to preserve all records related to **jnickels@thefiscon.com**. On or about November 6, 2017, Nsight was served with a request under 18 U.S.C. § 2703(f) to preserve all records related to **isagreg@lakefield.net**.

38.     I anticipate executing this warrant under the Stored Communications Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(a) AND 2703(c)(1)(A), by using the warrant to require Network Solutions, LLC/Web.com Group, Inc. and Nsight to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

39.     Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the computer systems in the control of

Network Solutions, LLC/Web.com Group, Inc. there exists evidence of a crime.

Accordingly, a search warrant is requested.

## ATTACHMENT A-1

### Property to Be Searched

This warrant applies to information associated with email address **jnickels@thefiscon.com** (the "account") that is stored at premises owned, maintained, controlled, or operated by Network Solutions, LLC/Web.com Group, Inc., a company headquartered at 12808 Gran Bay Parkway, West, Jacksonville, FL 32258 (the "Provider").

# ATTACHMENT B-1

## Particular Things to be Seized

**I.     Information to be disclosed by Network Solutions, LLC/Web.com Group, Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.     The contents of all emails stored in the account, including copies of emails sent from the account;

b.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of services used, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.     All records or other information stored by an individual using the account, including address books, contact and buddy lists, pictures and files;

d.     All records pertaining to communications between the Provider and any person regarding the account, including contact with support services and records of actions taken.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence or instrumentalities of violations of statutes listed on the warrant involving James Nickels and Gregory Anderson since 2006, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

      a.      Communications regarding the Fiscal Concierge, LLC, the Fiscal Concierge Manager, Inc., "Marketing Piece", marketing folder, and investment opportunity;

      b.      Records relating to who created, used, or communicated with the account.

## ATTACHMENT A-2

### Property to Be Searched

This warrant applies to information associated with email address **isagreg@lakefield.net** (the "account") that is stored at premises owned, maintained, controlled, or operated by Nsight., a company headquartered at 450 Security Blvd., PO Box 19079, Green Bay, WI 54307-9079 (the "Provider").

## ATTACHMENT B-2

### Particular Things to be Seized

### I.     Information to be disclosed by Nsight

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.  The contents of all emails stored in the account, including copies of emails sent from the account;

b.  All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of services used, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.  All records or other information stored by an individual using the account, including address books, contact and buddy lists, pictures and files;

d.  All records pertaining to communications between the Provider and any person regarding the account, including contact with support services and records of actions taken.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence or instrumentalities of violations of statutes listed on the warrant involving James Nickels and Gregory Anderson since 2006, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.  Communications regarding the Fiscal Concierge, LLC, the Fiscal Concierge Manager, Inc., "Marketing Piece", marketing folder, and investment opportunity;

b.  Records relating to who created, used, or communicated with the account.